# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY.

### MARCH TERM, 1899.

THE TRENTON POTTERIES COMPANY, complainant and appellant,

v.

RICHARD C. OLIPHANT et al., defendants and respondents.

[Filed July 7th, 1899.]

1. A letter giving an option for a certain period to purchase a business and its good will, described the vendors thus: "We, the undersigned, do business under the firm name of Oliphant & Co." It contained a clause: "We also agree that we will not directly or indirectly engage in" a competitive business within certain limits of space and time. It was only signed by the firm name. The option expired, and afterwards all the members of the firm signed a writing, addressed to the same buyer, extending the option to purchase for ninety days, which was to be attached to and made part of the original option. —*Held*, that the undertaking not to engage in competitive business is both joint and several and binds the firm and each of its members.

507

Trenton Potteries Co. *v.* Oliphant.

2. A contract that the vendor of a business and its good will will not engage in a competitive business, although a contract in restraint of trade, is not opposed to public policy, but is valid and enforceable when the restraint contracted for is partial and is reasonably required for the protection of the purchaser in the use and enjoyment of the business purchased, and is not otherwise injurious to the public interest. Whether, considering the changed conditions of trade and business, such a contract should now be pronounced against public policy if the restraint contracted for is general, but so broad a restraint is reasonably necessary for the protection of the purchaser, *quære.*

3. A contract of the vendors of a business and its good will bound them not to engage in the same business " within any state in the United States of America or within the District of Columbia, except in the State of Nevada and the Territory of Arizona, for the period of fifty years."—*Held,* that the description of the places within which the contract restrained the vendors is a divisible description, embracing not one whole area but several areas disjunctively described. The business which was the subject of the sale had never been carried on by the vendors in some of the areas covered by the description.—*Held, further,* that while the restraint contracted for in respect to such areas may be opposed to public policy and the contract to that extent may be unenforceable, the restraint contracted for in respect to areas within which the business had been carried on was reasonably required for the protection of the purchaser, and the contract to that extent is not in opposition to public policy and may be enforced.

4. When the purchaser of a business and its good will is a corporation empowered by legislative grant to engage in carrying on such a business for the period of its corporate life, a contract by the vendor not to engage in competitive business for a period substantially coincident with the purchaser's corporate life is not unreasonable.

5. Eight manufacturers of sanitary pottery ware, who produced nearly all of that ware manufactured in this country, formed an association and agreed to regulate the price of such ware according to the vote of a majority of its members.—*Held,* that, assuming that such ware has become a commodity of so great importance to public health and comfort that the public has an interest in its manufacture and sale, such a combination is opposed to public policy as creating or tending to create a monopoly; contracts among independent and unconnected manufacturers looking to the control of the prices of their manufacture by limitation of production, by restriction on distribution or by express agreement, are opposed to public interest and unenforceable.

6. Simultaneously with the purchase of the business in question, the purchaser also acquired by purchase four other potteries. The five vendors had been engaged in the manufacture of sanitary pottery ware and were members of the association. The purchaser thus acquired a majority of the members.—*Held,* that, although the simultaneous purchases gave the purchaser the opportunity to control the action of the association and such may have been its purpose, the contracts of sale and purchase and the incidental contracts con-

nected therewith are not rendered invalid thereby but may be enforced; the public interest will be protected by invalidating the agreement for the control of prices.

7. Each of the five vendors contracted with the purchaser not to engage in competitive business in terms substantially like those contained in respondents' contract, and thereby five of the principal plants for producing sanitary pottery ware became the property of one owner, and the previous owners were excluded from using their capital and business experience and knowledge in competition with the new owner.—*Held,* that, although contracts to restrain and limit competition in the production of some commodity in the manufacture and sale of which the public have an interest are repugnant to public policy, a restraint or limit upon competition may result from contracts which the courts are bound to enforce. Thus, in the absence of legislative prohibition (if such could be imposed), courts would be obliged to recognize and enforce contracts for the purchase by an individual manufacturer of the business of his competitors, even to the last one, although such purchases tend to eliminate competition, and the last purchase would completely exclude it, at least for a time.

8. Under our liberal corporation laws, corporations may be formed to engage in and carry on almost every conceivable manufacture or trade. They are empowered to acquire property and the control of other corporations. Acts which corporations do under these broad legislative grants cannot be pronounced by the courts to be repugnant to public policy. The legislative grants of power fix the character and limit of public policy in that regard. A corporation thus empowered to engage in and carry on a certain manufacture may buy the business of its competitors, and courts cannot pronounce contracts for such permitted purchases invalid, although they tend to produce, and may temporarily produce, a monopoly of such manufacture.

9. Contracts incidental to such permitted purchases, and reasonably required to protect the purchaser in the enjoyment of the business purchased, cannot be pronounced by the courts to be against public policy for the same reason.

On appeal from a decree advised by Vice-Chancellor Grey, whose opinion is reported in *Trenton Potteries Co.* v. *Oliphant, 11 Dick. Ch. Rep. 680.*

*Mr. William M. Lanning, Mr. Garret D. W. Vroom,* and *Mr. Lewis Cass Ledyard* (of the New York bar), for the appellant.

*Mr. Samuel D. Oliphant, Jr., Mr. Richard V. Lindabury,* and *Mr. Joseph H. Choate* (of the New York bar), for the respondents.

The opinion of the court was delivered by

MAGIE, C. J.

The appeal in this cause is from a decree of the court of chancery, made upon the advice of Vice-Chancellor Grey, dismissing appellant's bill of complaint and denying the relief sought thereby.

The pleadings in the cause, the issues presented and the facts established by the proofs are set out with such completeness in the opinion of the learned vice-chancellor and the statement preceding it that it is unnecessary to repeat them here.

The bill was filed by appellant against the seven defendants and respondents to restrain the breach of contracts alleged to have been made by them with it. It was dismissed as to all the respondents upon the ground that the contracts in question were in illegal restraint of trade and against the public policy of the state. As to three of respondents, the dismissal was also put on other grounds. As to James V. Oliphant, one of respondents, one additional ground was that he had not become bound to appellant by any such contract. As to him and also as to Richard C. and Henry D. Oliphant, also respondents, the additional ground for dismissal was that the proofs disclosed no breach of the contracts on their part.

The appeal is from the whole decree, but counsel for appellant conceded in the argument that although Richard C. and Henry D. Oliphant were proved to have been bound to appellant by the contracts which the bill sought to enforce, yet that no sufficient evidence of any breach of those contracts by them appeared. It results that so much of the decree as dismisses the bill as to them must be affirmed.

But appellant contends that the dismissal of the bill as to James V. Oliphant cannot be supported upon the additional grounds assigned therefor. This contention requires a review of the proofs touching the relation of James V. Oliphant to the contracts in question, which were contracts to abstain from the manufacture of pottery ware. The first contract claimed was contained in a letter addressed to one Tapscott, dated January

23d, 1891, and signed "Oliphant & Co.," which is set out in the prefatory statement of the vice-chancellor. The other contract relied on was contained in a sealed instrument, dated July 6th, 1892, purporting to be made between the seven respondents and Tapscott, also to be found in that statement. This writing was executed by all the respondents except James V. Oliphant.

The proofs show that, at the date of the letter in question, James V. Oliphant was not a member of the firm of Oliphant & Company. He became a member about January 1st, 1892. The letter gave Tapscott an option to purchase at a stated price the pottery business carried on by Oliphant & Company, including the real estate, plant and good will, which option was to be exercised within a limited period. That period had expired when James V. Oliphant became a member of the firm. On February 1st, 1892, all the members of the firm, including James V. Oliphant, signed a writing addressed to Tapscott, extending the option originally given for a period of ninety days. The option was accepted by him on May 20th, 1892. On May 21st, 1892, an agreement of sale was signed by all the members of the firm except James V. Oliphant. But on May 23d, 1892, he executed under seal a memorandum of agreement to the terms and conditions mentioned in the agreement of the other owners of the property which was the subject of the sale. The sale was consummated on June 6th, 1892. Tapscott was acting in the transaction for those who formed the corporation which is the appellant, and for that corporation after its formation on May 27th, 1892. Appellant acquired all Tapscott's rights in the contracts with respondents.

The vice-chancellor reached the conclusion that the bill should be dismissed as to James V. Oliphant, because not having executed the sealed instrument of July 6th, 1892, he had not become bound by its covenants, and because the contract of the letter of January 23d, 1891, adopted and ratified by him by his joining in the extension of the option by the writing of February 1st, 1892, was a joint and not a several contract, and merely bound the firm of Oliphant & Company not to engage in a competitive business.

The omission of James V. Oliphant to execute the instrument of July 6th, 1892, unquestionably deprives appellant of any right to enforce its provisions against him in this cause.

If necessary to construe the contract contained in the letter of January 23d, 1891, I think it would be difficult if not impossible to hold it to be a mere partnership undertaking. No doubt an obligation entered into by more than one person is presumed to be joint, and a several responsibility will not arise except by words of severance. *Alpaugh* v. *Wood, 24 Vr. 638.* But the purpose of this letter was to give an option to purchase a business carried on by individuals who were partners. It recites that "we, the undersigned," do business under a firm name and own and control the Delaware pottery, which was the subject of the offer to sell. It contains an agreement that, in case of sale, "we will not, directly or indirectly," engage in a competitive business. In my judgment, it would not be an unnatural or strained construction to attribute to these words a several force, and to find that the firm signature thereto bound the members of the firm not merely jointly but also severally. Upon any other construction it is obvious that the protection of the business and good will proposed to be sold would only be partially secured.

But we are not required to construe the terms of the letter by themselves. By the extension of the option by the writing executed by all the firm members, including James V. Oliphant, on February 1st, 1892, a several quality in the contract contained in that letter, either was recognized as originally in it or was imparted to it. By that instrument each partner agreed to an option of purchase for a fixed period, and that such agreement should be part of the original option given by that letter. When they all executed that instrument and declared that it was to be attached to and become part of the original option, the then owners made a new contract, in the terms of the former contract, which bound those signing as if they had signed the original option with the extended term. The contracts thus amalgamated stipulated that in the event of sale "we will not directly or indirectly" engage in a competitive business. These

words, over individual signatures respecting a business previously averred to be a partnership business, indicate several as well as joint undertakings. It is as if they undertook that they would not directly, by their joint act as a firm, or indirectly, by any several act of any member, engage in a competitive business. This construction is greatly aided by the exception from the undertaking, whereby the proposing vendors are permitted to engage in the business of manufacturing pottery ware as agent or employe of the proposing purchaser. These words indicate a relation which might be formed between vendors and purchaser in case of sale effected. While the firm could become the purchaser's agent, it could not in any other sense become his employe. Individual members of the firm might become either agents or employes. The exception therefore indicates that the contract it limited was one affecting individual members of the firm.

As James V. Oliphant, upon this construction, became bound by this contract, and as the proofs show that he has broken it, the decree dismissing the bill as to him cannot be supported on this ground.

It is next to be considered whether the decree can rest upon the ground that the contracts sought to be enforced are in illegal restraint of trade.

The contract contained in the letter of January 23d, 1891, and the covenant of June 6th, 1892, are the obligations which the bill was filed to enforce. They are identical in terms and purport to bind respondents to absolutely refrain from engaging in the business of manufacturing pottery ware " within any state in the United States of America or within the District of Columbia, except in the State of Nevada and the Territory of Arizona, for the period of fifty years." They are contracts in restraint of trade.

This court, speaking by Chief-Justice Beasley, more than thirty years ago, declared that contracts in general restraint of trade are illegal. *Brewer* v. *Marshall, 4 C. E. Gr. 537.* The learned chief-justice found that to have been the undisputed rule of the English and of our own courts since the decision

33

in 1711 of *Mitchell* v. *Reynolds, 1 P. Wms. 181.* In that cele-
brated case Lord Macclesfield placed the illegality of such con-
tracts upon the sole ground of their being inimical to the public
interest or public policy. To the same origin the rule denying
validity to such contracts was attributed by the chief-justice
in our leading case above cited. Our court of chancery has
announced and applied the rule, and upon the same ground.
*Mandeville* v. *Harman, 15 Stew. Eq. 185; Sternberg* v. *O'Brien,
3 Dick. Ch. Rep. 370; Althen* v. *Vreeland, 36 Atl. Rep. 479.*

In determining what is the public policy in this regard we
have, however, to take into account certain contracts which
restrain trade. It is of public interest that every one may freely
acquire and sell and transfer property and property rights. A
tradesman, for example, who has engaged in a manufacturing
business and has purchased land, installed a plant and acquired
a trade connection and good will thereby, may sell his property
and business with its good will. It is of public interest that
he shall be able to make such a sale at a fair price and that his
purchaser shall be able to obtain by his purchase that which he
desired to buy. Obviously, the only practical mode of accom-
plishing that purpose is by the vendor's contracting for some
restraint upon his acts, preventing him from engaging in the
same business in competition with that which he has sold. His
contract to abstain from engaging in such competitive business
is a contract in restraint of trade, but one which, from the time
of *Mitchell* v. *Reynolds* to this time, has been recognized as not
inimical to, but permitted by, public policy. Therefore, while
the public interest may be that trade in general shall not be
restrained, yet it also permits and favors a restraint of trade in
certain cases.

Contracts of this sort which have been sustained and enforced
by courts have been generally declared to be such as restrain
trade, not generally, but only partially, and no more extensively
than is reasonably required to protect the purchaser in the use
and enjoyment of the business purchased, and are not otherwise
injurious to the public interest. This is the doctrine declared
and applied in the court of chancery and recognized in this

court by our affirmance of its decrees. *Richardson* v. *Peacock, 11 C. E. Gr. 40; S. C., 1 Stew. Eq. 151; S. C., 6 Stew. Eq. 597; Mandeville* v. *Harman, supra; Finger* v. *Hahn, 15 Stew. Eq. 606; S. C., 17 Stew. Eq. 604; Sternberg* v. *O'Brien, supra.*

It is observable that of late and elsewhere it has been questioned whether the rule as thus stated is not too broad to be applicable to present conditions. In 1711 trade was subject to limitations which have largely diminished or ceased to exist. Where orders and responses had to be transmitted by mail or messenger, and the mail and travelers were carried by coaches drawn by horses, and goods were transported by pack or wagon, the area of the trade of a manufacturer or tradesman was necessarily limited by those conditions. Now that orders and responses may be transmitted for long distances by telephone and over the world by telegraph, and goods and travelers may have quick transit over land and sea, the area of such trade may be immensely greater. Thereupon, it is contended with great force that the true test of the validity of such contracts in restraint of trade is to be found alone in their being reasonably essential to the protection of the purchaser, and that, considering the vast extent of the area of some trades, there are cases in which a general restraint cannot be held to be unreasonable. *Diamond Match Co.* v. *Roeber, 106 N. Y. 473; Nordenfelt* v. *Maxim, &c., Co., App. Cas. 535 (1894); Rousillon* v. *Rousillon, 14 Ch. Div. 351; Leather, &c., Co.* v. *Lorsont, L. R. 9 Eq. 345; Morse Trust Drill Co.* v. *Morse, 103 Mass. 73; Gibbs* v. *Consolidated Gas Co., 130 U. S. 396; E. Underwood & Son* v. *Barker, 1 L. R. Ch. 300 (1899).*

The question thus suggested does not arise in this case unless the contracts before us are found to be contracts in general restraint of trade. This leads us to inquire whether they are general or only partial in their restraint, and, if the latter, whether they extend beyond what is reasonable for a fair protection of the business and good will which appellant purchased from respondents.

The contention on the part of respondents is that the contracts in question restrain them from engaging in the business of

manufacturing pottery ware in an area comprising the whole United States, and that the exception of one state and one territory was illusory and colorable because they claim the proofs show that such manufacture cannot be carried on in those localities with profit. It is insisted that a restraint extending over the whole nation is a general and not a partial restraint.

It was well said by Judge Andrews, in his opinion in *Diamond Match Co.* v. *Roeber, ubi supra,* that " the boundaries of the states are not those of trade or commerce." It may also be said that in these days the business of many concerns extends not only beyond the boundaries of the state in which it has a local habitation, but even beyond the limits of the nation. Yet the public policy of that state may be involved in favor of or against the restraint of such trade however widely extended. It is possible to conceive of a business so widely extended that a restraint of it within the limit of one country might be in fact but a partial restraint.

In the case last cited an exception of one state or territory similar to that contained in the contracts in question was pronounced not colorable, but the case does not indicate that the exception was shown by the proofs to be of territory in which the restrained manufacture could not be carried on with practical results. In this case the proofs establish that to be the fact as to the area included in the exception. It is contended for appellant, however, that the fact so established is immaterial because the rule against general restraint of trade is an arbitrary one, and an exception from the restraint, however unsubstantial or illusory, will make the restraint partial. It is not easy to perceive how a rule of this character, founded on considerations of public policy and applied in the public interest, can be rightly deemed arbitrary in the sense intended in this contention. Nor is it obvious that the courts would permit the evasion of the rule by illusive contrivances.

But the question presented need not be decided unless the contracts, properly construed, extend the restraint of respondents over the whole area of the United States except the excepted parts. If, by the true construction, the contracts are divisible

and bind respondents to a restraint in one or another of separately described areas, and, as applied to one or more of such areas, the restraint is not unreasonable, the suggested question need not be solved.

The area or areas within which the restraint upon respondents is engaged for in these contracts is described as being, not (as stated in the opinion below) within any state *of* the United States of America, but " within any state *in* the United States of America."

In seeking the meaning of this description we are to be guided by the ordinary rules of construction. We may presume that the contracting parties intended to make a valid contract and, in this case, under the doctrine enunciated in *Brewer* v. *Marshall*, that they designed to contract for a restraint which would be partial and not general, and reasonable, in their judgment, for the protection of the purchaser in the enjoyment of the subject of the purchase. The contracts are to be construed so as to give them validity, if such construction does no violence to their language, and the subject-matter of the contracts is to be considered and their terms are to be construed in reference thereto. Here the transaction was the sale and purchase of an established business, with its good will, and the contracts in question were plainly intended to furnish protection to the purchaser in the enjoyment of the things purchased. Respondents received a large sum of money for what they sold appellant, which they yet retain, and it is clear that the consideration thus received and retained must have been enhanced in amount by the obligation of the contracts now in question, and that so much could not have been obtained by the respondents if no obligation to restrict competition had been made.

Examining thus the description of the area within which the restraint agreed to by respondents is to operate, I have reached the conclusion that, without doing any violence to the language or straining its import, it may be and ought to be held to be a divisible description, embracing not one whole area but several areas disjunctively described. The exception of the Territory of Arizona is urged as inconsistent with this construction. But

the express inclusion of the District of Columbia equally militates against the contrary construction, for if the description covers the whole area of the United States of America, the District of Columbia was already included. Looking at the subject of the contracts, their presumed intent and the purpose of any agreement to restrain respondents from engaging in a competitive business, the description can be read as applicable disjunctively to different areas, as within the State of Maine, within the State of New Hampshire or within the State of New Jersey, &c., or within the District of Columbia, excepting, &c., and such should be its construction.

Thus read, the contracts in question are applicable to all the described areas and are enforceable in those of them within which the restraint contracted for is reasonably required for the protection of appellant in the use and enjoyment of the business and good will acquired from respondents.

An instructive case on this point has lately been decided in England. The question arose upon a covenant by an employe with his employer, that within twelve months after leaving his employment he would not engage in a similar business " in the United Kingdom, or in France, or in the Kingdom of Belgium, or Holland, or in the Dominion of Canada." The employe voluntarily left the service of his employer and entered into the employment of a merchant in the same trade in England. Upon a bill by the first employer, Mr. Justice Kekewich allowed an injunction against the breach of the covenant. Upon appeal the cause was heard in the chancery division before Lindley, master of the rolls, and Lord-Justices Rigby and Vaughan Williams. The master of the rolls and Lord-Justice Rigby held that the covenant was a separable one and was not unreasonable as to the restraint imposed on the covenantor within the United Kingdom, and they sustained the injunction. Vaughan Williams dissented, but upon the ground that the restraint within the whole of the United Kingdom was unreasonable. *E. Underwood & Son* v. *Barker, ubi supra.*

It is next to be considered whether the contracts in question, thus construed, were reasonably required for. the protection of

appellant,' and to what extent, if any, they should be enforced under the proofs in the cause.

It appears by the proofs that the business which appellant purchased of respondents had been carried on by them within an area, roughly speaking, covering the states east of the Mississippi river and north of a line drawn through Richmond and Louisville, including the District of Columbia.

Appellant contends that such contracts were reasonably required to protect it, not only in the areas in which the business it purchased of respondents had been carried on, but also in other states to which it might extend that business. But this contention I deem to be inadmissible. The validity, in this respect, of such contracts is to be tested by the effect upon the business and good will sold and purchased. What is reasonably required to protect that may be upheld. But the vendor can no more contract to restrict his use of his trade or calling beyond such protection than he could do if he had made no sale at all. Such a contract would be opposed to public policy.

But while it results from this view that the contracts in question, so far as they restrain respondents from engaging in the same business in localities in which the business purchased by appellant of them had never been carried on may be opposed to public policy, it does not follow that they are wholly unenforceable. Contracts including distinct and separable oblitions, some of which are legal and some prohibited, are enforceable as to such obligations as are legal. *Erie Railway C,* v. *Union Locomotive, &c., Co., 6 Vr. 240; Stewart* v. *Lehigh Valley Railroad Co., 9 Vr. 505.* These contracts, as to areas described therein in which the acquired business had been carried on, may be enforced upon proper proofs.

Upon the proofs, how far may these contracts be enforced? The prayer of the bill is for an injunction in the terms of the contracts. But this would be too broad a restraint on respondents, because it would include localities in which the purchased business had never been carried on and where no protection of it was required. Upon the proofs I conclude that no restriction can be imposed upon respondents as to any area beyond the

State of New Jersey. In this state all the respondents except Richard C. and Henry D. Oliphant are actively engaged in the very business they contracted not to engage in. There is some proof of sales and solicitation of trade in other prohibited areas, but it lacks the requisite certainty to justify a broader injunction.

It remains to consider other objections to the reasonableness of these contracts. It is contended that they are unreasonable because they restrain respondents from the manufacture of any pottery ware while the business sold is claimed to have been that of manufacturing sanitary pottery ware. But the plant respondents sold was adapted to the manufacture of other kinds of ware, and they had in fact manufactured other ware. The business purchased was not the mere manufacture of sanitary pottery ware, and the contracts were not too broad in furnishing appellant protection in respect to the manufacture of all pottery ware.

It is further objected that the contracts in question extend the restraint upon respondents over too great a period of time. The ages of respondents, it is said, show that, at the expiration of the limit of fifty years, probably some of them will have died and all of those surviving will have passed the age of business activity. The contracts are not unlimited in time, but the insistment is that they are unreasonable because of the long limit of restraint. But whether they are reasonable is not to be determined by their disadvantageous effect upon respondents, but by considering whether the restraint to which, for what they received as a sufficient consideration, they bound themselves was reasonably required to protect the purchaser in the enjoyment of his purchase. As they were dealing with a corporation which had acquired a corporate life of fifty years for the purpose of carrying on this business, the limit of time fixed by the contracts is not unreasonable. The fact that the limit exceeds the corporate life of appellant by a few days does not, in my judgment, require a different conclusion.

It remains to consider whether the contracts in question are otherwise against the public policy of our state. The learned

Trenton Potteries Co. v. Oliphant.

vice-chancellor held them to be opposed to the public interest, because he conceived that they tended to create a monopoly in the business of manufacturing sanitary pottery ware. This effect he deemed established by the proofs that appellant, simultaneously with its purchase from respondents, also purchased four other plants used in the manufacture of such ware in Trenton, and the property, business and good will of their owners, and took from each of those vendors contracts restraining them from engaging in the business of manufacturing pottery ware, substantially identical with the contracts taken by it from respondents. The contracts procured from respondents he deemed to be part of a scheme to control the production, distribution and sale of sanitary pottery ware and to exclude competition therein. Such ware he declared, on the authority of the promoters of appellant, to be a necessity of life.

The scheme held to be reprehensible was found in the situation disclosed in the proofs. Respondents, as owners of the business sold to appellant, had, several years before the sale, united with the owners of seven other potteries in Trenton, which made, among other things, sanitary pottery ware, in an association called the "American Sanitary Potters' Association." That association had in some way controlled the prices at which such ware produced by its eight members (counting the owners of each pottery as one member) should be put upon the market. The action of the association in that regard was determined by a majority of its eight members. By its purchases appellant acquired the interest of five of the members, and seems to have been permitted to cast a vote for each in controlling the action of the association. After appellant's purchases prices were so controlled for some time and until the association fell to pieces.

Contracts by independent and unconnected manufacturers or traders looking to the control of the prices of their commodities, either by limitation of production or by restriction on distribution, or by express argument to maintain specified prices, are without doubt opposed to public policy. The contract of the sanitary potters' association in this regard was inimical to public interest when respondents were members of it, and none the less

so when appellant acquired the property of five of its members. However solemnly the members of that association may have obligated themselves to obey the behests of the majority in respect of the control of prices of their ware, no court would have enforced their agreements or awarded damages for any breach of them.

But the contracts by which appellant acquired the property and business of respondents and of four other members of the association contained no term stipulating for the continuance of the association or for the enforcement of any objectionable agreements it had entered into. At the most, so far as appears, the contemporaneous purchases by appellant gave it an opportunity to use the majority vote in the association for such control of prices as its agreements provided for. Although the control of the voting majority of the association may have been one of appellant's motives for making its simultaneous purchases, it is inconceivable that any one of the five vendors could have repudiated his contract to sell to appellant on the ground that such sale, if consummated, would enable appellant to obtain such control. The public interest would be amply protected by invalidating the agreement of the association for the control of prices and the disconnected agreement of sale would be enforced as other contracts.

It is further urged that the simultaneous contracts procured by appellant create, or tend to create, a monopoly, because they stipulate for the removal of many competitors in the business of manufacturing sanitary pottery ware. The owners of five of the eight potteries in Trenton manufacturing that kind of ware (and there were but few, if more than one, elsewhere) thereby agreed not to engage in that business for a long period of time and over a great extent of country. The engagement of respondents in that respect has been found not to be an improper restraint of trade nor inimical to public policy on that ground, but a contract partially enforceable upon respondents, if not otherwise objectionable. The engagements of the other vendors who sold their properties and business to appellant are similar in terms to that entered into by respondents, and furnish a reasonable pro-

tection to appellant of the business and good will purchased by it of each of them. Each sale and each incidental contract against competition are, for reasons before given, unobjectionable. Are they rendered objectionable by the fact that, being simultaneously made, they excluded from engaging in the business of manufacturing sanitary pottery ware so large a proportion of those previously engaged in that manufacture?

It is to be observed that the contracts of respondents and the other vendors to appellant restricted them from engaging in the business of manufacturing, not sanitary pottery ware alone but all pottery ware. The proofs show that a large number of persons are engaged in manufacturing pottery ware in various parts of the country, and that the contracts in question would exclude from competition a very small proportion of them. But as the proofs also show that the main purpose of appellant was to engage in the manufacture of sanitary pottery ware, I have stated the proposition in a more restricted form.

Whether sanitary pottery ware has become a necessity of life is open to question. It is certain that many persons manage to exist without using it. But if its use is of importance to health and comfort, and a considerable and increasing number of persons desire to acquire and use it, the public may have such an interest in its manufacture and sale that public policy will justify judicial interference and refusal to enforce illegal combinations to enhance its price. The elimination of competition may produce that result. The contracts in question were not intended to withdraw, and do not appear to have withdrawn, from work a single workman in that industry. They restrain a comparatively small number of capitalists who had previously employed their capital in such manufacture from continuing so to do. The entire capital of the country, except theirs, is free to be employed in the manufacture. There seems no ground for the claim that we should refuse to enforce respondents' contracts by injunction when the proofs furnish no reason for the belief that the public will suffer if they are held to their bargains.

The contemporaneous contracts were all made as incidental to the sale and purchase of competing concerns engaged in the

manufacture of sanitary pottery ware. They were, as we have seen, reasonably appropriate to the protection of the purchaser in each case. While contracts to restrain or limit competition in the production of that ware may be repugnant to the public interest, such a restraint or limit may result from contracts which the courts are bound to enforce. A person engaged in any manufacture or trade, having the right to acquire and possess property and to do with it what he chooses, may lawfully buy the business of any of his competitors. His first purchase would at once diminish competition. If he continued to purchase, each succeeding transaction would remove another competitor. If his capital was large enough to enable him to buy the business of all competitors, the last purchase would completely exclude competition, at least for a time. But in the absence of legislative restrictions (if such could be imposed) upon the acquisition of such property and its use when so acquired courts could impose no limitation. They would be obliged to enforce such contracts, notwithstanding the effect was to diminish or even to exclude competition.

But appellant is a corporation and not an individual. Corporations, however, may lawfully do any acts within the corporate powers conferred on them by legislative grant. Under our liberal corporation laws, corporate authority may be acquired by aggregations of individuals, organized as prescribed to engage in and carry on almost every conceivable manufacture or trade. Such corporations are empowered to purchase, hold and use property appropriate to their business. They may also purchase and hold the stock of other corporations. Under such powers it is obvious that a corporation may purchase the plant and business of competing individuals and concerns. The legislature might have withheld such powers or imposed limitations upon their use. In the absence of prohibition or limitation on their powers in this respect, it is impossible for the courts to pronounce acts done under legislative grant to be inimical to public policy. The grant of the legislature authorizing and permitting such acts must fix for the courts the character and limit of public policy in that regard. It follows that a corporation empowered

to carry on a particular business may lawfully purchase the plant and business of competitors, although such purchases may diminish or, for a time at least, destroy competition. Contracts for such purchases cannot be refused enforcement.

Since contracts by individuals and by corporations having legislative authority, for the purchase of competing plants and business, may be made and are enforceable, although as a result thereof competition is diminished or temporarily destroyed, it further follows that contracts reasonably required to make such purchases effective by protecting the purchaser in the use and enjoyment of the thing purchased, cannot be declared by the courts to be repugnant to public policy. The interference with competition resulting from such purchases under legislative permission, being found not to invalidate contracts for such purchases, the like interference by contracts reasonably required for the protection of the purchaser cannot be held to invalidate them.

The result is that the decree appealed from must be affirmed as to Richard C. and Henry D. Oliphant, but as to the other respondents it must be reversed and a decree be made enjoining them according to the prayer of the bill within the State of New Jersey.

*For reversal (in part)*—The Chief-Justice, Van Syckel, Dixon, Garrison, Gummere, Ludlow, Bogert, Nixon, Adams, Vredenburgh—10.

*For affirmance*—Lippincott, Hendrickson—2.