The complainant is the owner of a number of patents covering sound producing devices known as "voices" and "criers" which are used in dolls and toys. On January 4th, 1932, it and the defendant, with others, entered into an agreement, of which paragraph 8 thereof reads as follows:
"8. The parties of the second part, including not only the corporate parties, Karl Ohlbaum and Son, Inc., and Metal Tone Mfg. Co., Inc., but also the principals thereof, namely, Karl Ohlbaum and Samuel B. Ohlbaum of Karl Ohlbaum and Son, Inc., and Elias B. Kriegsfeld and Matteo De Cesare of Metal Tone Mfg. Co., Inc., severally and jointly hereby undertake and agree not to engage in the United States *Page 325 
or its territories, directly or indirectly, in the business of manufacturing and/or selling any sound producing devices either of the type known in the trade as `criers' or that known as `mama voices,' for a period of eighteen (18) years beginning Jan. 1, 1935, the date of the termination of the license aforesaid. The said parties and each of them severally and jointly hereby specifically agree that they will not, for the stated period of eighteen (18) years, directly or indirectly make or cause to be made, sell or cause to be sold, or in any manner organize, set up, participate in, enter, join, be employed by, or be directly or indirectly interested in any organization, business, firm, or corporation engaged in the manufacture or/and sale of either said `crier' or `mama voice' sound producing devices."
The fifth paragraph of the same agreement reads:
"5. The parties of the second part jointly and severally agree to assign, transfer and set over at and upon the termination of the license period aforesaid all the certain tools and dies which were, have been and shall during said license period be employed by them and each of them in the manufacture of the `crier' aforesaid unto the party of the first part, and further agree that all such tools and dies will be delivered to the party of the first part at its place of business at 146-8 Center Street, Newark, New Jersey, or any other place that may be designated by the party of the first part not later than January 31st, 1935."
The bill of complaint seeks to restrain the violation of the terms of paragraph 8, and prays also for the specific enforcement of the terms of paragraph 5.
The agreement which contains the above-quoted paragraphs arose through differences and difficulties between the complainant and Karl Ohlbaum Son, Incorporated, of New York. A patent infringement suit was instituted by the complainant against the last named, who was the sole and exclusive selling agent of the defendant company. The stock of the defendant company is closely held, and it is controlled by the individual defendants, Elias B. Kriegsfeld and Matteo De Cesare, both of whom are the executive officers of the defendant company. Kriegsfeld and De Cesare actively participate in the conduct and control of its affairs.
The agreement discloses that the defendants recognize the validity of all of the letters patent set forth and mentioned in the final consent decree, adverted to in the agreement. *Page 326 
These defendants agreed not to contest or aid others in contesting the validity of the patents referred to. The agreement granted to Karl Ohlbaum Son, Incorporated, and the defendant company, a non-exclusive, non-transferable right and license to manufacture and sell sound producing devices under complainant's patents, for which royalties were to be paid, and suitable books of account were to be kept, c. Under the terms of the agreement, Karl Ohlbaum Son, Incorporated, and the defendant company, were required to transfer and deliver the tools and dies used by them in the manufacture of the sound producing devices on the termination of the license, to the complainant.
In accordance with the terms of the agreement, Karl Ohlbaum 
Son, Incorporated, divested itself of its patent rights, and agreed to assign to the complainant, not only the patent rights, but all improvements thereon made during the license period. In the agreement, these defendants stipulated and agreed, not to engage in the United States, or its territories, directly or indirectly, in the business of manufacturing and selling any sound producing devices, either of the type known as "criers" or that known as "mama voices" for a period of eighteen years beginning January 1st, 1935 (as above provided in paragraph 8). The answer to the complaint filed herein, admits that the defendant company manufactured and sold sound producing devices for dolls, and that it is "now selling sound producing devices."
The defendants set up five separate defenses; the first is, in effect, that the restrictive covenant contained in paragraph 8 of the agreement of January 4th, 1932, was part of a general scheme and design to create a monopoly, and that the covenant is therefore unenforceable. The second defense is that the covenant contained in paragraph 8 is greater than was necessary for the protection of the complainant in its business. The third defense is that the covenant in paragraph 8 was not ancillary to a contract of sale or the transfer of a business, or good-will, and that, in consequence, it is unenforceable. The fourth defense is that the covenant in paragraph 8 related only to the seven patents enumerated in the *Page 327 
agreement and the particular type of "criers" then being manufactured by the defendant, Metal Tone Manufacturing Company, Incorporated, and, that the "criers" now being manufactured by the Metal Tone Manufacturing Company, Incorporated, do not in any way violate the terms of the agreement. The fifth defense is that the relief sought by the complainant is for the protection of patents, and, therefore, is not within the jurisdiction of this court.
As a purported recognition of the terms of paragraph 5 of the agreement, the defendant company delivered certain tools and dies to the complainant, which it rejected and refused to accept. The complainant says that they are not the tools and dies which were the subject of paragraph 5 of the agreement. The evidence submitted by the complainant in support of its attitude of refusal, in my opinion, establishes the fact that the defendant company evaded its obligation and presented to the complainant, not the discussed tools and dies, but a spurious imitation of them. Part of the testimony furnished by the complainant on this phase of the suit was given by a former employe of the defendant company, who for several years had been using the tools and dies of the defendant company. He declared, after an inspection by him of the delivered tools and dies in the presence of the court, that those tools and dies which the defendant admittedly offered to the complainant, were not the specified tools and dies of the agreement.
The defendants, without qualification, solemnly declared and covenanted that they would not, for a period of eighteen years, manufacture or sell either "criers" or "mama voice" sound producing devices in these United States. In consequence of their declaration, they received, evidently, a satisfactory and valuable consideration. The agreement, and every feature of it, was approved by the defendants at the time of its execution by the parties to it. The objections they have since raised against the agreement existed when they indicated their approval of it by their signatures and corporate seals. Why did they not then protest? Why did they wait until they had received and enjoyed the benefits of the consideration *Page 328 
due under the agreement? No satisfactory or equitable reason appears for their delayed protest. Their consent to it "is an act of reason accompanied with deliberation, the mind weighing as in a balance, the good and evil on each side; and equity assumes when competent and informed men express it, they mean just what they say." Hall v. Finn, 116 N.J. Eq. 34. The defendants accepted and presumably were satisfied with the consideration given them by the complainant in return for their promise to observe the terms they specifically promised to perform. The court assumes that when these defendants consented to become parties to the agreement, that they did it unqualifiedly and without any mental reservation, and that they intended to make a binding and valid agreement. Chancellor Walker, when a vice-chancellor, said in Artistic Porcelain Co. v. Boch,76 N.J. Eq. 533, that:
"In these cases it is held that the court will presume that the parties intended to make a valid contract and that they designed to provide a restraint which will be reasonable."
To the same effect, Chief-Justice Gummere, speaking for the court of errors and appeals, in the case of FleckensteinBrothers Co. v. Fleckenstein, 76 N.J. Law 613, said:
"The construction of this contract which makes the description of the restricted area divisible is certainly a possible one, and it seems to me that when a vendor endeavors to steal from his vendee the business which he has sold, having in his pocket the moneys which were paid to him for it, courts should be diligent in the endeavor to find a way to prevent the consummation of so fraudulent a scheme. As was said by Lord Macnaghten inNordenfeldt v. Maxim, c., Co. (1894), App. Cas. 573, in speaking of a case like the present, it seems almost absurd to talk of public policy in connection with such a case. It is a public scandal when the law is forced to uphold a dishonest act, and the public suffers no injury in being deprived of the privilege of dealing with a man who is carrying on his business in violation of his solemn engagement not to do so."
The defendants now declare that the extent of space granted *Page 329 
to the complainant under the agreement is entirely too broad, and clearly unreasonable. A further reference to Chancellor Walker's opinion in Artistic Porcelain Co. v. Boch, supra. furnishes the answer to that declaration; he said:
"In Pingrey's Treatise on the Law of Contracts (1905),tit. "Restraint of Trade," 340 et seq., the author lays it down that the result of the English authorities appears to be that, where the restraint is without qualification, it is unreasonable and contrary to public policy, but where it is subject to some qualification, either as to time or space, the question is whether it is reasonable, and, if reasonable, it is good in law; that reasonableness depends upon all the circumstances, which must be duly weighed in each case; that the American decisions have not gone so far as the English, but that the old law has been a great deal modified in some jurisdictions; that the generality of time or space must always be an important factor in the consideration of reasonableness, although not per se a decisive test; that what is reasonable in a given case is a question not of fact, but of law for the court."
To the same effect is the principle enunciated in TrentonPotteries Co. v. Oliphant, 58 N.J. Eq. 507; Scherman v.Stern, 93 N.J. Eq. 626, and Fleckenstein Brothers Co. v.Fleckenstein, supra.
The business for which protection is sought in the bill of complaint is not confined to a small corner of this nation; it is broad and nationwide in scope, and it is based upon patents issued by the United States government. The territory covered in the agreement, in my opinion, is not too extensive, but is reasonably required for the protection of the complainant. The complainant argues that the restraint is not general but partial; being limited to the United States, or its territories, which obviously excludes the rest of the world. I am inclined toward the soundness of its argument. It is supported by the ruling expressed in Trenton Potteries Co. v. Oliphant, supra, in which the court of errors and appeals, among other things, said:
"It may also be said that in these days the business of many concerns extends not only beyond the boundaries of *Page 330 
the state in which it has a local habitation, but even beyond the limits of the nation."
And it further said: "It is possible to conceive of a business so widely extended that a restraint of it within the limit of one country might be in fact but a partial restraint."
The complainant has shown that it sells its product to doll manufacturers wherever doll manufacturers are located in the United States. Such manufacturing business is not a particularly extensive one, and it is conducted at certain central cities in the United States where the complainant finds its markets. The reasonableness of a restraint is presented in an attractive way in 13 Corp. Jur. 467 § 410 (particularly at p. 475), where the following is expressed:
"Each case in which the question of reasonableness of restraint arises must be determined according to its own particular facts and the subject-matter, the situation of the parties, and the circumstances should be considered, the nature of the business restrained being as important a consideration as the elements of time and place. A restraint to be reasonable must be such only as to afford a fair protection to the interests of the party in favor of whom it is given and not so large as to interfere with the interests of the public. Subject to this qualification, it may extend to all the territory in which the business has been carried on, or wherein the covenantee's trade is likely to go, although co-extensive with the United States, and there are cases which go to the extent of holding that a general restraint of trade may be sustained where it is no more than is necessary to the protection of the interest involved."
One of the leading cases on the question of reasonableness of space is Diamond Match Co. v. Roeber, 106 N.Y. 473;13 N.E. Rep. 419. The principle enunciated in this last case is that the restraint may be co-extensive with the United States.
The period of limitation — eighteen years — finds support as a reasonable limitation in the courts of this state. Our court of errors and appeals in the case of Scherman v. Stern, supra, has held that an agreement, unlimited in point of time, is not *Page 331 
objectionable where it is reasonably limited in point of space. In that case, Mr. Justice Trenchard, speaking for the court of errors and appeals, which unanimously affirmed the order of the court of chancery in granting a preliminary injunction, said (117 Atl. Rep. 633):
"The agreement was, therefore, one where the restraint was reasonably limited in point of space but unlimited in point of time. Whatever may be the rule respecting contracts to desist from the practice of a learned profession (Mandeville v.Harmann, 42 N.J. Eq. 185; 7 Atl. Rep. 37) certainly it is no objection to an agreement not to compete with a mercantile business, that the restraint is unlimited in point of time, when [as here] it is reasonably limited in point of space. Carll v.Snyder (Ch.), 26 Atl. Rep. 977; Finger v. Hahn, 42 N.J. Eq. 606; 8 Atl. Rep. 654; affirmed, 44 N.J. Eq. 604;17 Atl. Rep. 1104; Trenton Potteries Co. v. Oliphant, 58 N.J. Eq. 507;43 Atl. Rep. 723; 46 L.R.A. 255; 78 Am. St. Rep. 612."
A period of twenty years is held reasonable in the case ofFleckenstein Brothers Co. v. Fleckenstein, supra. A limitation of fifty years was held reasonable in TrentonPotteries Co. v. Oliphant, supra. In the case last mentioned (58 N.J. Eq. 507, 515), the court said:
"It is observable that of late, and elsewhere, it has been questioned whether the rule as thus stated is not too broad to be applicable to present conditions. In 1711 trade was subject to limitations which have largely diminished or ceased to exist. When orders and responses had to be transmitted by mail or messenger, and the mail and travelers were carried by coaches drawn by horses, and goods were transported by pack or wagon, the area of the trade of a manufacturer or tradesman was necessarily limited by those conditions. Now that orders and responses may be transmitted for long distances by telephone, and over the world by telegraph, and goods and travelers may have quick transit over land and sea, the area of such trade may be immensely greater. Thereupon, it is contended with great force that the true test of the validity of such contracts in restraint of trade is to be found *Page 332 
alone in their being reasonably essential to the protection of the purchaser, and that, considering the vast extent of the area of some trades, there are cases in which a general restraint cannot be held to be unreasonable. Diamond Match Co. v.Roeber, 106 N.Y. 473; Nordenfeld v. Maxim, c., Co. (1894),App. Cas. 535; Rousillon v. Rousillon, 14 Ch. Div. 351;Leather, c., Co. v. Lorsont, L.R. 9 Eq. 345; Machine Co. v.Morse, 103 Mass. 73; Gibbs v. Consolidated Gas Co.,130 U.S. 396; 9 Sup Ct. 553; Underwood v. Barker (1899), 1 Ch.300."
In the case of Fleckenstein Brothers Co. v. Fleckenstein,supra, Mr. Justice Gummere (76 N.J. Law — at p. 617). among other things, said:
"Ordinarily it is a reasonable presumption that parties intend to make a valid contract; that in a case like the present they design to provide a restraint which will be reasonable, in their judgment, for the protection of the purchaser in the enjoyment of the subject of the purchase (Trenton Potteries Case 517), and I see nothing in the language used by these parties which requires the conclusion that their intention was that unless the full measure of protection afforded to the plaintiff by the contract was capable of enforcement against the defendant, there should be no protection at all against competition by the latter." Katz
v. Newman, 97 N.J. Eq. 284.
The evidence clearly shows that the defendants have breached the covenant in the city of Jersey City, which, of course, is in the neighborhood of New York and Newark, where the business of the complainant has been and is now being conducted.
The defendants rely somewhat on the principles expressed in section 515 (6) of the American Law Institute's Restatement ofthe Law of Contracts, which read as follows:
"A restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it is based on a promise to refrain from competition and is not ancillary either to a contract for the transfer of good-will or other subject of property or to an existing employment or contract of employment." *Page 333 
The agreement which the defendants attack unquestionably is ancillary to several valuable property rights. It is certainly ancillary to a license agreement and it cannot be successfully contended that a license agreement, under the circumstances, is not a valuable subject of property. Again it is ancillary to, and incidental to the transfer of patents, machinery, equipment and good will of the promissors. In Artistic Porcelain Co. v.Boch, supra, the court sustained a covenant where it was made not by the vendor of the business, but by the purchaser. The court in that case said:
"The bill of complaint alleges that the complainant corporation on July 25th, 1906, entered into an agreement in writing with the defendant, which recited that the complainant was then manufacturing black and brown door knobs, shutter knobs, and wheels at the plant of the American Porcelain Works, so called, and the complainant thereby sold to the defendant all right, title and interest it might have in the goods, chattels, stock in trade, chemicals, materials, and other personal property then on the plant of the American Porcelain Works, for which the defendant agreed to pay a certain price, and the agreement then proceeds: `The said Boch further agrees as an important part of the consideration of this sale and transfer that he will abstain from the manufacture or sale directly or indirectly of porcelain, or of any imitation thereof, except tile, until January 1, Nineteen hundred ten, except as hereinafter provided.'"
To the same effect is the rule in Fleckenstein Brothers Co.
v. Fleckenstein, supra, which was not the case of a sale of a business, but of the sale of stock of one stockholder to the corporation. The court in that case sustained the covenant without comment. A similar principle is expressed in Wood v.Whitehead Brothers Co. (1901), 165 N.Y. 545, by the New York court of appeals sustaining such a contract. Part of the opinion says:
"That a man may not contract as he will with respect to himself or to his property rights demands the intervening of some authoritative reason founded in considerations of public policy. The denial of the right can only be reasonable, *Page 334 
when to permit its exercise is seen to be fraught with consequences injurious to the interests of society. * * * The doctrine, which avoids a contract for being one in restraint of trade, is founded upon a public policy. * * * In the present practically unlimited field of human enterprise, there is no good reason for restricting the freedom to contract, or for fearing injury to the public from contracts which prevent a person from carrying on a particular business. Interference would only be justifiable when it was demonstrable that in some way the public interests were endangered. But contracts between parties, which have for their object the removal of a rival and competitor in a business, are not to be regarded as contracts in restraint of trade. They do not close the field of competition except to the particular party to be affected. To say at the present day that such a contract as was made in this case was affected by public interest and was a matter of public concern would be unreasonable. Such a contract not only does not obstruct trade. but it may be for the advantage of the public as well as of the individual."
An agreement annexed to a license (approaching the instant case) was sustained in Mouchel v. Wm. Dubitt Co., 24 R.P.C.194 (Reports of Patent Design, Trade-mark and other casesreported in London, 1907). In that case, Mr. Justice Neville says:
"The law has been determined with regard to covenants in restraint of trade by authorities which, at all events, bind us, and such covenants are not void unless they are unreasonable as long as they do not extend further than is necessary for the reasonable protection of the covenantee's trade. It must, I think, be a reasonable protection. For instance, if the covenantee's business is confined to London, but he gets an occasional order from the provinces, a restraint covering the whole of England would probably be held to be too wide; whereas, if his place of business was in London, and he employed travelers all over England, such a restraint is beyond the reasonable requirements of the covenantee's trade, and, if it be not, the effect upon the covenantor does not come *Page 335 
into consideration. I see no difference in this respect between covenants in restraint of trade whether they are found in assignments of good will, licenses by a patentee, or contracts with employers."
Covenants similar to the one in the agreement under discussion are to-day widely enforced and the enforcement does not conflict with the principles expressed in the Restatement of the Law ofContracts, above cited.
The contention of the defendant that the complainant is a combination of many corporations, which had been engaged in the business of manufacturing sound producing devices for dolls, and that its present constitution is an illegal combination, which is in restraint of trade, which justifies them in violating their agreement is without force and is wholly ineffective. That defense is somewhat old and it is not always successful. TrentonPotteries Co. v. Oliphant, supra; Massie v. Asbestos BrakeCo., 95 N.J. Eq. 298; Radio Corporation of America v. HygradeSylvania Corp., 10 F. Supp. 879.
Vice-Chancellor Grey discussed quite thoroughly, in TrentonPotteries Co. v. Oliphant, supra, certain alleged monopolistic practices of the complainant, unquestionably in restraint of trade, and calculated to be injurious to the public interest. The complainant there was a result of an amalgamation of many large potteries in the city of Trenton, New Jersey, and the acquisition by it of these interests created in it a dominant voice in the American Sanitary Potters Association, an association which, it was alleged, controlled prices in a manner conceivably opposed to public policy. The court of errors and appeals took a different view and they held that the monopolistic practices of the complainant were irrelevant to the issue, suggesting that these practices, if inimical to the public interests, could be remedied in other forums, saying:
"The public interest would be amply protected by invalidating the agreement of the association for the control of prices, and a disconnected agreement of sale would be enforced as other contracts."
And further:
"The contracts in question were not intended to withdraw, and do not appear to have withdrawn, from work, a single *Page 336 
workman in that industry. They restrain a comparatively small number of capitalists, who had previously employed their capital in such manufacture, from continuing so to do. The entire capital of the country except theirs, is free to be employed in the manufacture. There seems no ground for the claim that we should refuse to enforce respondents' contracts by injunction, when the proofs furnish no reason for the belief that the public will suffer if they are held to their bargains.
"The contemporaneous contracts were all made as incidental to the sale and purchase of competing concerns engaged in the manufacture of sanitary pottery ware. They were, as we have seen, reasonably appropriate to the protection of the purchaser in each case. While contracts to restrain or limit competition in the production of that ware may be repugnant to the public interest, such a restraint or limit may result from contracts which the courts are bound to enforce. A person engaged in any manufacture or trade, having the right to acquire and possess property, and to do with it what he chooses, may lawfully buy the business of any of his competitors. His first purchase would at once diminish competition. If he continued to purchase, each succeeding transaction would remove another competitor.
"If his capital was large enough to enable him to buy the business of all competitors, the last purchase would completely exclude competition, at least for a time. But in the absence of legislative restrictions, if such could be imposed, upon the acquisition of such property, and its use when so acquired, courts could impose no limitation. They would be obliged to enforce such contracts, notwithstanding the effect was to diminish, or even to exclude competition."
In Radio Corporation of America v. Hygrade Sylvania Corp.,supra, United States District Court Judge Forman said:
"The law is too well settled to question the general rule that an allegation in a suit for infringement of a patent, trade-mark, or copyright to the effect that the plaintiff is a party to an unlawful combination does not constitute a *Page 337 
defense. Brown Saddle Co. v. Troxel (C.C.),98 Fed. Rep. 620; Motion Picture Patents Co. v. Eclair Film Co. (D.C.),208 Fed. Rep. 416; Independent Baking Powder Co. v. Boorman
(C.C.), 130 Fed. Rep. 726; Virtue v. Creamery PackageManufacturing Co. (C.C.A.), 179 Fed. Rep. 115."
It is alleged that the restrictive covenant does not contemplate the device now being manufactured by the Metal Tone Manufacturing Company. Paragraph 8 of the agreement furnishes a complete reply to that allegation; its contents is quite plain and is without ambiguity. Its purport and effect is that the defendants would not engage, directly or indirectly, in the business of manufacturing or selling any sound producing devices, either of the type known to the trade as "criers" or that known as "mama voices." The attitude of the defendants in surreptitiously selling the manufactured devices, as the evidence discloses, goes to establish the fact that they are endeavoring to hide and conceal their conduct in violating their agreement. The evidence is that they were disposing of, and selling, these sound producing devices fraudulently; and that they urged their purchasers to conceal the purchase; and that they billed such sales of "crying voices" as "dolls eyes." That conduct certainly brands them with the taint of bad faith and amounts to a confession of consciousness of their misconduct. Their answer to the complaint says that it is "now selling sound producing devices." In J.I. Kislak, Inc., v. Artof, 176 Atl. Rep. 899, the court said:
"In this case the only question involved is whether or not men should be held to fair dealing and a compliance with the valid contracts that they make."
The points of defense raised by the answer are without force and have not been substantiated.
Under all the circumstances, I am satisfied that the business of the complainant has been injured and impaired and its clientele has been diverted to other courses. This damage is not readily ascertained, but it can be determined through the medium of an account. The complainant, therefore, instituted its suit in the proper forum for relief. J.I. Kislak v. *Page 338 Artof, supra. I am satisfied that the agreement, both as to time and space, and in all other respects, is reasonable, and that the defendants should not be permitted to evade their responsibilities under it.
The complainant seeks to compel specific performance of paragraph 5 of the agreement, and to restrain the defendants, consisting of two individuals and a corporation, from competing with it, and to restrain the competition herein related, it will affect no others out of the entire population of the country, but those mentioned in the complaint. Everyone else of the millions in this country is free and at liberty to compete with the complainant.
I shall advise an order granting the prayer of the bill. *Page 339