This is a vendor's bill for specific performance. The Association was seized of premises in Essex Fells, and defendants owned a house and lot in Caldwell subject to two mortgages aggregating $6,400. On October 23d 1934, the Association contracted to sell defendants the Essex Fells property for $10,000 to be paid or satisfied as follows: $100 forthwith, $300 on delivery of the deed, $7,000 by purchase-money mortgage, and the balance, $2,600, by the conveyance to the Association of the property in Caldwell. Further, the Association agreed to assume the mortgages on the Caldwell property. The agreement fixed November 24th for the passing of title but did not make time of the essence. On the Association's plot was a dwelling house into which, pursuant to a clause in the contract, defendants moved at the end of October.
A day or so after Thanksgiving, defendants discovered on the property a cesspool which served a nearby house owned by Mr. and Mrs. Southard. Thereafter, on December 1st, defendants paid the Building and Loan Association the initial deposit on the contract, $100. Apparently they did not mention the cesspool to their attorney, Mr. Bolger, until January or February. When they did so, I gather he told them that it was an encumbrance or cloud on the title. The right to use the cesspool does not appear in the record title of the property and the existence of the cesspool was entirely unknown to the Association and its officers until February when they learned of it from defendants.
On April 2d, Mr. Bolger wrote Mr. Brady, attorney of the Association, fixing Saturday, April 13th, as the day for delivery of the deed and stating, "we will consider time as of the essence of the contract and if a closing is not effected on that date, we will demand a return of the deposit together with reasonable search fees, c."
April 5th the Association and the Southards executed an agreement by which the former agreed that it would construct a septic tank on the latter's property and connect it with the dwelling and pending the completion thereof that the *Page 427 
Southards might continue to use the cesspool upon the Association's property. On April 12th, the Southards executed to the Association a quit-claim deed which, in conjunction with the agreement, had the effect of releasing their right to use the cesspool, subject, however, to their privilege under the contract to continue its use until the septic tank should be installed. The next day, complainant tendered a deed which defendants refused to accept on several grounds, one of which was the existence of the cesspool. The other reasons for rejecting the tender had never before been advanced and have since been abandoned. Defendants were aware that work on the septic tank had actually started a day or so before and they also knew of the Southard suit claim and contract. On April 15th, defendants vacated complainant's house. The septic tank was completed and the connection between the Southard property and the cesspool was cut about a week later. The Association then tried to make another tender but defendants did not attend at the appointed time and place.
Defendants contend that complainant unreasonably delayed the carrying out of the contract which it now seeks to enforce, so I must inquire into the cause of the delay.
Counsel for the two parties, promptly after execution of the contract, began to examine the titles. Mr. Brady, for the Association, on November 15th, wrote Mr. Bolger, raising a question with reference to defendants' title. One Johnson had owned the property subject to mortgage and had died intestate survived by a widow and minor children. The mortgage was immediately foreclosed and the property bought in by Mrs. Johnson at the sheriff's sale. From her, defendants purchased. Mr. Brady feared that this was a friendly foreclosure prosecuted in order to cut off the title of the infants, and that they might still have an interest. December 6th, Mr. Bolger wrote Mr. Brady that he had examined the question and was satisfied that his clients' title was marketable, but correspondence and conferences between the lawyers continued. They decided to endeavor to obtain quit-claims from the two Johnson children who had reached their *Page 428 
majority and Mr. Brady suggested that defendants give bond indemnifying the Association against any claim by the minor child. Toward the end of January, the quit-claims were procured. The question of a bond remained under consideration.
On learning of the cesspool early in February, Mr. Brady looked into the matter and then drafted an agreement with the Southards and sent it to Mr. Bolger on February 18th for his suggestions. On March 8th, Mr. Brady called on the Southards to discuss a release. They had an uncle who was a lawyer and was expected home from the south shortly and they were unwilling to commit themselves until they had his advice. The uncle returned on March 28th and evidently approved the arrangement, for the agreement was executed a week later. The very next day, the Association made a contract with the plumber to do the necessary work. He made application to the municipality for a permit, received it on April 11th and immediately started in. There was no unnecessary delay on the part of the Association.
As a general rule, in equity, time is not deemed to be of the essence of the contract, unless the parties have expressly agreed that it shall be, or unless it necessarily follows from the nature and circumstances of the transaction. Where time is not essential, the vendor is entitled to a decree of performance, if he can give clear title at the time of making the decree. Gerba
v. Mitruske, 84 N.J. Eq. 141. Vice-Chancellor Backes, inOrange Society of New Jerusalem v. Konski, 94 N.J. Eq. 632;affirmed, 95 N.J. Eq. 254, established the law of this state that when the day of settlement named in the contract has passed, either party may make time of the essence by formal demand that title be closed on a given day. When the parties by agreement make time of the essence, they will be bound thereby, however short the time they fix. But when one of the parties seeks to impose a day on the other, he must act in good faith and reasonably under all the circumstances. Thus in the OrangeSociety Case, consummation of the deal was delayed pending action by the municipal authorities and such action was expected within a couple of weeks; demand for performance within one *Page 429 
week was held unreasonable, especially since the vendee's demand was made, not for the reason that time was of importance to him, but rather because he wanted to back out of the contract.
That is the precise case before me. The defendants knew when they demanded performance that the Southards were willing to give a quit-claim and that the drainage easement would end as soon as the necessary papers could be signed and the physical work done. A few weeks more could make no difference to them, as they were already occupying the house.
But defendants say that complainant agreed to the day set. What happened was this: Mr. Bolger phoned Mr. Brady suggesting that title be closed. He replied that any Saturday would be satisfactory. Then followed the letter setting April 13th. Mr. Brady did not suspect he was being led into a trap. He assumed with reason that defendants intended to take title in the situation then existing; that they were willing the Southards should continue to use the cesspool for a short period after defendants should become seized of the land. Not until he met the defendants on April 13th, did he know their purpose to rescind.
The demand for performance was not made in good faith. About March 11th, Mr. Bolger had told Mr. Brady that defendants desired to be released. On March 27th, Mrs. Henry appeared at a meeting of the directors of complainant and requested to be relieved of the contract; she did not like Essex Fells and her health was becoming impaired; she disliked the thought of being liable on the mortgage bond or on the indemnity bond. Her request to be released was refused, but one of the officers of the Association said that the demand for the indemnity bond might be dropped and in fact it was not thereafter mentioned, and when the deed was tendered the defendants were not asked to execute such a bond. Mrs. Henry also urged the Southards not to execute the quit-claim to the Association. It is quite evident that defendants were seeking a way out of their obligation; that they used the cesspool as an excuse and that they fixed the *Page 430 
day for closing, with the undisclosed purpose of refusing performance. Time did not become of the essence of the contract.
Lastly, defendants say that the contract should not be enforced because it is ultra vires in that it obligates the Association to purchase defendants' property and to assume payment of the mortgages thereon. The Building and Loan Association act (P.L.1925 p. 189; Cum. Supp. Comp. Stat. p. 134), gives such associations no general power to invest in land. Section 26, as amended, authorizes purchase of land "already contracted to be sold to the members of such association," and of land to be used for the association's office, while section 64 empowers the association to buy real estate upon which it may have a lien or in which it may have an interest. It is clear that complainant would have no right as a separate transaction to purchase defendants' property. Has it power to take the land as part consideration for the sale of land it already owns?
A sale is a transmutation of property from one party to another in consideration of some price or recompense in value. The consideration may be any agreed equivalent. Berger v. UnitedStates Steel Corp., 63 N.J. Eq. 809, 817. A sale is no less a sale because the consideration is land and not money. Haber v.Greenfield, 92 N.J. Law 367. Section 14 of the statute gives every association power to sell lands owned by it on terms according to, and not inconsistent with, its constitution. I assume, since counsel do not assert the contrary, that the terms of the sale to defendants are not inconsistent with complainant's constitution.
A grant of express powers to a corporation carries with it incidental powers, "the right to use all the means suitable and proper to accomplish the end which the legislature had in view."State v. Hancock, 35 N.J. Law 537; Ellerman v. ChicagoJunction Railways, c., Co., 49 N.J. Eq. 217, 241. Thus a railroad company may buy more land than it actually requires for its right-of-way, when its only purpose is to secure what it does need upon the easiest terms. "The true test in all such cases is the good faith of the transaction. *Page 431 
Was the purchase made to accomplish an object falling within the general purpose and scheme of the corporation? If so, it would be a legitimate exercise of power." Delaware, c., Co. v. Welser
(Pa.), 81 Atl. Rep. 994. "Acts which, if standing alone, or when engaged in as a business, would be beyond the powers of the corporation, are not necessarily ultra vires when they are merely incidental to, or form part of it, an entire transaction that, in its general scope, is within the corporate purpose * * *. The validity of transactions like these is to be determined from their general character considered as a whole rather than by segregation into individual parts and each regarded as distinct from the others; though undoubtedly a corporation would not be sustained in uniting a legitimate corporate act with one * * * unauthorized for the purpose merely of enabling it to accomplish the latter." Central Ohio, c., Co. v. Dairy Co. (Ohio),53 N.E. Rep. 711.
The agreement of the Association to accept defendants' property in part consideration for the sale to them of its own land, and its agreement to assume the mortgages on defendants' property, form incidental parts of a single transaction which is within the scope of the Association's powers, namely, the sale of its land. The transaction will reduce the Association's investment in real estate by $1,000, increase cash $400 and mortgage investment $7,000, made possible in part by the fact that the Association will not at the present time pay in full for defendants' land but will assume the mortgages thereon. The wisdom of the deal was for the directors of the Association to determine. The contract is not ultra vires.
 I will advise a decree for specific performance. *Page 432