This suit is brought for an injunction and for an accounting of profits. The commodity concerning which the dispute has arisen is a domestic heating boiler, and the rights sought to be protected and enforced arise out of a written contract between the complainants, on the one hand, and the defendant Bogue Electric Company, on the other hand. For the purpose of convenience that defendant will henceforth be referred to as "Bogue." The complainant company will hereafter be referred to as "Consolidated." It is the assignee of the letters patent hereinafter mentioned, which patent was obtained by the complainant Burkhart and by him assigned to the complainant company.
Sometime in 1945 Burkhart conceived and reduced to the form of a sketch his idea for a new type of vertical tubular heating boiler. He planned to apply for and obtain letters patent for that type of boiler and to place it on the market. His first activity in the direction of production was to submit his sketch to Shinman, the president of Bogue. Bogue had the plant and facilities to manufacture the boiler. When delivering the sketch to Shinman Burkhart told him that he hadn't yet any patent for the boiler, that the boiler was his "baby" and that he, Burkhart, wanted to keep the idea entirely within his own control. Burkhart requested, and Shinman promised, that the plans for the boiler would be kept a secret. Thereafter, on or about December 27th, 1945, Burkhart applied to the Patent Office for a patent on the boiler. That application was pending until it ripened into the actual grant on November 27th, 1947, of the letters patent which were introduced into evidence before me. That patent has been assigned to and is the property of Consolidated.
Burkhart's original sketch was developed into a set of plans from which the boiler could be manufactured. Some time prior to July 10th, 1945, Burkhart delivered those plans to Bogue and the latter undertook to manufacture for Consolidated boilers in accordance with those plans. Bogue's president, Shinman, undertook to keep those plans secret. Thereafter Bogue manufactured and sold to complainants a number of boilers constructed in accordance with those plans. A *Page 553 
dispute arose between the parties which translated itself into a bill in this court, filed by Consolidated and Burkhart as complainants against Bogue. In that bill it was charged that Bogue had several hundred boilers, manufactured for the complainants under said plans, which it refused to deliver to complainants. It was further charged that Bogue intended to apply complainants' invention to its own use and to manufacture and sell this particular boiler for Bogue's own account and profit. The bill sought to enjoin Bogue from selling those boilers to any third person and from manufacturing for and selling to third parties any additional boilers constructed under the complainants' plans, and, further, that Bogue account for the sale of those boilers made to third parties. That suit was settled by a formal agreement made on May 21st, 1946, between Consolidated and Burkhart, on the one side, and Bogue, on the other. In consideration of the discontinuance of the then pending Chancery suit, Bogue agreed as follows:
1. It represented that it had on hand 220 boilers completed in accordance with the drawings attached to the settlement agreement. Those were the drawings furnished by the complainants to the defendant Bogue. Bogue further represented that it would complete an additional 73 boilers in approximately three weeks from the date of the agreement and another 330 boilers in "approximately" five months from that date, making a total of 623 boilers, all of which were to be constructed in accordance with complainants' plans.
2. Bogue agreed forthwith upon the completion of those boilers to furnish their serial numbers to the complainants, together with invoices for the completed boilers, and the complainants agreed forthwith to deliver to Bogue their shipping orders, together with a check for $131 for each completed boiler having a steam trim low water cut-off combination and a tankless heater.
3. Bogue agreed that upon receipt of shipping orders and check in payment of the boilers it would properly prepare the boilers for acceptance by a common carrier for delivery and that the time for shipping should be extended in the event there is any railroad or truck strike interfering with shipment in accordance with complainants' instructions. *Page 554 
Paragraph 2 of the settlement agreement and the alleged breach thereof by Bogue are responsible for the instant suit. That paragraph reads as follows:
"The party of the second part [defendant Bogue] does hereby covenant and agree with the parties of the first part that it shall not manufacture, sell, or deliver to any person, firm or corporation any boiler constructed in accordance with the drawings annexed hereto, made part hereof, and marked `Schedule A,' particularly but not by way of limitation insofar as samerelates to internal baffling, save and except the 623 boilers hereinafter referred to which are to be sold to the parties of the first part as herein described." (Italics mine.)
The settlement agreement contains within itself a release by complainants of Bogue from all liability asserted in the first Chancery suit, but it is provided that if Bogue in the future sells or delivers any boiler constructed according to the attached drawings (other than the 623 boilers to be delivered to the complainants), then the release is to become ineffective as of the date thereof. Obviously, the intention of the parties was to restrict the sale of this particular boiler to Burkhart, the creator of the idea and design, and to Burkhart's company, Consolidated, so that if Bogue manufactured and sold the like boiler to any other person it, Bogue, should lose the benefit of the release so conditionally given.
The first delivery of boilers under the settlement agreement was under an invoice sent by Bogue on May 27th, 1946 (ExhibitD-4). It was for 293 boilers, representing the 220 boilers which Bogue in the settlement agreement represented as complete plus the 73 boilers which it undertook to complete in approximately three weeks. Thus within six days from the date of the settlement agreement Bogue tendered delivery of this very large number of boilers, 73 of which complainants might reasonably have anticipated in approximately three weeks. This invoice was sent to complainants' place of business in Boston. Burkhart came to Bogue's Paterson plant and wanted the boilers shipped in varying quantities to different destinations. Bogue's president, Shinman, refused to do so, although it would have made no difference to Bogue, since under the contract all shipments were to be f.o.b. Bogue's plant at Paterson. He told Burkhart: "You take them *Page 555 
all right now." A few days later Bogue's New York attorney, Mr. Abraham J. Halprin, sent his letter under date of June 3d 1946, addressed to Consolidated at its Boston office. That letter stated that because the invoice had been sent one week before and payment had not been made, the contract stood broken. However, Mr. Halprin gave Burkhart two days within which to make payment, else Bogue would elect to terminate the contract (Exhibit C-3). Before that letter reached Burkhart, he appeared on June 4th, 1946, at Bogue's Paterson plant. Burkhart endeavored to work out some plan for shipping the boilers. There was in existence at the time a railroad strike and Burkhart wanted shipments made as he could spot railroad cars. Shinman declined to discuss any such arrangement, although the 293 boilers had not yet been prepared for shipment and it would take, according to Shinman, between two weeks and two months to prepare them for shipment. Shinman insisted upon payment in full at once. Burkhart immediately consulted his New Jersey attorney, Mr. Norbert Burke, who on June 5th, 1946, sent a telegram to Halprin (Exhibit C-5) explaining that complainants could not possibly arrange to have railroad cars remain on a siding for two weeks or two months, awaiting Bogue's completion. The telegram threatened court action and called upon Bogue to reply immediately, fixing a shipping date. On June 6th the attorneys for the respective parties worked out the mechanics for the delivery of the 293 boilers by means of trucks to be furnished by the complainants (Exhibit C-6). The same day complainants' attorneys sent to Mr. Halprin the usual form of bill of sale for the 293 boilers, and in the accompanying letter assurance was given that immediately upon the execution of the bill of sale a certified check for $38,383 would be delivered to the bearer of the bill of sale. Several days later, when notice was given that the bill of sale was ready, Burkhart was in Montreal. His New Jersey counsel immediately communicated with him and Burkhart forthwith arranged through his bank in Boston for the transmission of the funds to the Elizabeth bank of the firm of Herr, Gordon and Burke. On June 11th that firm's certified check for $38,383, to the order of Bogue, was delivered by Mr. Welt *Page 556 
(of the named law firm) to Bogue's Paterson plant. Mr. Welt asked for the opportunity to inspect and count the boilers before making payment. This opportunity was refused him. Despite this refusal he immediately delivered the check and obtained the bill of sale. Thereafter, in due course, the 293 boilers were delivered, although it is not disputed in the case that some of the boilers lacked peephole covers and low water cut-offs, a condition which would have been revealed had the sought-for inspection been allowed.
From the foregoing it will be seen that although these two contracting companies were a considerable distance apart, one in Boston and the other in Paterson, no unreasonable period of time elapsed between Bogue's invoice of May 27th and complainants' payment in full on June 11th, a total of two weeks. The details concerning the first delivery of the very large number of boilers has been here stated by me to show the arbitrary and unreasonable attitude of Bogue and its president, Shinman, once the first Chancery suit was discontinued and they were possessed of the release which terminated the liability asserted in that suit. That attitude explains much in relation to the subsequent dispute over only 18 boilers, which dispute brought on the second — the instant — suit. True, the contract between the parties calls for payment forthwith upon the rendition of the invoices for the boilers, but that can hardly mean that the parties thereby meant instantaneous payment. Neither the time for delivery of the boilers nor the time for the payment therefor is anywhere in the contract made of the essence and undoubtedly the parties intended that each shall have a reasonable time for the performance of its respective undertakings. By the express language of the contract Bogue reserved unto itself "approximately" three weeks within which to complete 73 of those boilers, and yet within six days from the making of that contract it sent an invoice for a number of boilers inclusive of those 73 boilers. Complainants could not reasonably have been expected to anticipate such early and sudden tender of delivery and need not have been prepared forthwith to accept such delivery. Again, the opportunity of inspection was one that the complainants could reasonably claim. They were *Page 557 
purchasing from Bogue boilers of a certain special type, required to conform to plans and drawings upon which the parties expressly agreed. Complainants were entitled to a fair and full opportunity to see whether such compliance was in fact present. Neither the language of the contract nor the principles of fair dealing required the complainants to pay for a cat in the bag. Implicit in the nature of the transaction was a reasonable opportunity of inspection, something which Bogue denied the complainants. This was more than idle caprice. It bore injury. After paying for the 293 boilers the inspection then had revealed deficiencies which, though not many or too serious, nonetheless would have entitled complainants to decline acceptance of the objectionable items. The correspondence which passed between the parties and their attorneys in respect of this delivery of 293 boilers, the position taken by Bogue and Shinman and their counsel, Mr. Halprin, and Mr. Shinman's attitude on the witness stand before me all convince me that from the very beginning there was a decided unwillingness on the part of Bogue to carry out its contract in good faith, that it was looking for a fight and an opportunity to terminate the contract. Why should Bogue have desired such escape when complainants were not only ready but eager to accept the boilers and pay for them, asking only for reasonable notice and an opportunity to inspect and count? The answer is found in the proofs before me of sales thereafter made to others of the very same type of boilers at substantially higher prices and the further fact that Bogue manufactured these boilers in large numbers and in excess of the 623 limited in the settlement agreement. It is plain to me that Bogue repented the settlement agreement, saw an opportunity to sell to third parties at a higher market price (Exhibit C-20) and, what is more important, to escape, possibly, its express covenant to respect the integrity and property right of the complainants in their boiler. Much of its purpose stands revealed in the subsequent conduct of Shinman, when the second and final dispute between these parties arose concerning 18 additional boilers.
On June 17th, 1946, only six days after complainants had paid for 293 boilers, Bogue sent to complainants' Boston office *Page 558 
an invoice for 18 boilers (Exhibit D-5). These were part of the 330 boilers which Bogue under its settlement agreement undertook to complete in approximately five months from the date of the agreement. Complainants had a right to assume that those 18 boilers might not be ready for tender to them until as late as October 21st, 1946. Yet unexpectedly and without any previous notice Bogue sent its invoice on June 17th. By this time the complainants were already aware that some of the 293 boilers theretofore delivered had been incomplete. The very day that the invoice for the 18 boilers was mailed Burkhart, accompanied by a Mr. Toker, called upon Shinman at Bogue's plant. Shinman said that he wanted one day's notice when a railroad car would be spotted to take these 18 boilers. The very next day Bogue was notified by letter (Exhibit C-7) that a railroad car would be spotted at Paterson on June 20th. On June 21st, Bogue's attorney, Halprin, stated in a letter (Exhibit C-8) that Bogue would not load the boilers on the railroad car but that the loading would have to be done by complainants. This position was taken notwithstanding the fact that the contract provides that the shipments were to be f.o.b. Paterson. Be this as it may, again complainants sought the opportunity to inspect and count the boilers and again this was denied them. In the letter of June 25th, written by complainants' counsel, he took the position that complainants did not intend to pay for incomplete boiler units, that they required some proof that the boilers carried with them peephole covers and other items missing from earlier deliveries. The previous day Bogue's counsel, Halprin, had written (ExhibitC-10) to Boston that unless the 18 boilers were paid for by certified check by four P.M. the very next day (June 25th), Bogue would terminate the contract and all of complainants' rights thereunder. Halprin must have known that this letter would not reach Boston until the 25th or 26th, and yet he expected Consolidated to deliver payment the very next day. In taking this position Bogue not only demanded payment instanter but expected that complainants would abandon their demand that they be given an opportunity to inspect and count the boilers for which payment was being demanded. On June 29th Bogue was notified *Page 559 
(Exhibit C-13) that Burkhart, who was then in Pennsylvania, would be at Bogue's plant on Monday, July 1st, or Tuesday, July 2d, with a check for $2,358 to pay for the 18 boilers. On July 2d Mr. Welt went to Bogue's plant, bringing with him a certified check for that amount. He was kept waiting several hours but was not permitted to see Shinman or his sister, the secretary of the company. Welt then tendered the check to Shinman's personal secretary, which tender was refused without explanation. But the reason may be perceived in the circumstance that that very day, July 2d, Bogue sent its letter (Exhibit C-14) to complainants' Boston office, stating that because of its (Consolidated's) non-payment, the contract was canceled, the cancellation to be effective immediately. This attempted cancellation was repudiated the next day by complainants' attorneys by their telegram of July 3d to the effect that they would require a bill of sale and the boilers on Friday, July 5th. On this latter date, Mr. Welt, together with Burkhart, called at the Paterson plant. Welt had with him a certified check for $2,358. He walked into Shinman's office, who told Mr. Welt, "I am not here. I can't see you to-day." Welt told him that he was there to tender a certified check for the 18 boilers and actually tendered it. Shinman then said that he had no stenographer to do any typing. Welt said that all that he wanted was that Shinman execute the bill of sale that Welt had previously sent along. Shinman declined to do so, saying that he would not accept the check and that the Bogue plant would be closed all of the following week. Another tender was made by Welt by letter sent on July 10th. Again, on July 15th Burkhart and Welt went to Paterson to see Shinman and were told that Shinman was too busy to see them and that on the advice of counsel the tender of any check would be refused. Subsequently, and after the instant suit was pending, the 18 boilers were in fact delivered and paid for, but under a stipulation that that transaction shall be without prejudice to the defendant.
It will be observed that the interval of time between Bogue's invoice of June 17th for the 18 boilers and the first tender to Bogue of payment therefor on July 2d was two weeks. *Page 560 
For the reasons that I have above stated in connection with the like interval on the first tender of 293 boilers, I find that the two weeks' delay was not only a reasonable passage of time but one wholly justified in the circumstances of the case. I am satisfied that Bogue had no valid cause in law and in fair dealing for attempting to terminate its contract with complainants. If by its letter sent to Boston calling for payment the very next day at Paterson it attempted to make time of the essence, then it is manifest that that notice did not afford to the complainants a reasonable time to perform and such notice was altogether ineffective. Contracts may not be so lightly ended, nor their obligations brushed aside. There is not a single circumstance present in the case which made it a reasonable act on the part of Bogue suddenly to send its invoice and demand payment almost instantly. A delay of two weeks or even longer between invoice and payment is not an undue delay, particularly where the article is not perishable, is much in demand (witness Bogue's later sales) and where there is a bona fide request on the part of the purchaser to see and count that for which he is asked to make payment. That right of inspection is not only implicit in the nature of the transaction between the parties but is assured to the buyer by the express provisions of the Uniform Sale of Goods Law. As to the contract itself, it will be observed that there is nothing in it that rules out the ordinary right of a purchaser to see the article for which the seller demands payment, particularly here where the article is not standard but is a special product whose acceptability under the contract depends upon conformity to stipulated plans and specifications. Even an opportunity to count the boilers would not have been sufficient. Externally the boilers tendered by Bogue might appear to conform to the controlling plans and yet their interior construction might altogether deviate from what the parties agreed and what the buyer had a legal right to expect. If it were to be said that the provision of the contract for forthwith payment meant payment immediately upon tender of the boilers and did not admit of some reasonable margin of time for the buyer in Boston to arrange for the funds for payment and for the transportation *Page 561 
of the boilers from Paterson, yet an antecedent right of inspection was present. It was not the duty of the buyer to pay first and see later. No matter how prompt was to be the payment, the buyer's inspection had to precede it. Here the dispute between the parties was simply this: The seller wanted his money and to allow an inspection only after payment; the buyer tendered his money but demanded inspection at the time. If the buyer's claimed inspection was reasonable with respect to the first delivery of 293 boilers, it was surely essential with respect to the later tender of 18 additional boilers, for the buyer's experience on the first delivery showed such deficiencies as clearly indicated and dictated the need for future inspections before payment.
Our statute R.S. 46:30-53 provides that where goods are delivered to a buyer, which goods he has not previously examined, he is not deemed to have accepted the goods unless and until he has had "a reasonable opportunity of examining them for the purpose of ascertaining whether they are in conformity with the contract." Again the statute provides that when a seller tenders delivery of goods to a buyer, the seller is found, on request, "to afford the buyer a reasonable opportunity of examining the goods for the purpose of ascertaining whether they are in conformity with the contract." This latter rule governs all contracts for the sale of goods unless the parties agree to the contrary. Nowhere in the contract between these parties is there to be found a contrary agreement or a waiver of this right of inspection. I therefore hold that complainants' duty to pay for the 18 boilers did not arise until the defendant Bogue afforded them a reasonable opportunity of inspection. That it always refused to allow. Therefore, the two weeks spent by the complainants in a futile effort to obtain that inspection of the 18 boilers are not a delay chargeable against the complainants and did not justify Bogue's attempted cancellation of the contract. This would be true at law as it is in a court of equity, although in the equity jurisdiction payment or other performance is never regarded as being of the essence of a contract, unless the contracting parties have expressly so stipulated or unless it necessarily so follows from the nature *Page 562 
of the transaction. Caldwell Building and Loan Association v.Henry, 120 N.J. Eq. 425, 428; 185 Atl. Rep. 394. I therefore conclude and hold that complainants' two-week delay in paying for the 18 boilers was justified and therefore constituted no breach of the contract, that Bogue's seizure upon that delay as a cause for cancellation is untenable, and that the contract here involved subsists between the parties as a valid and binding obligation.
What was behind Bogue's attempted cancellation? I have already indicated that higher prices obtainable in the open market for the Burkhart boiler presented quite a temptation to Bogue. Bogue's later sales were at higher prices. But there is other proof which removes all speculation. There is uncontroverted evidence before me that before the defendant attempted to cancel its contract and while the parties were in dispute as to complainants' claim for inspection, Bogue's sales manager, a Mr. La Molla, informed complainants' representatives that Bogue wanted to manufacture the Burkhart boiler for persons other than complainants. Upon being reminded that Bogue was restricted from so doing, La Molla offered a royalty of $1 per boiler. Upon this offer being rejected, Mr. La Molla stated that that was all that Mr. Shinman would grant by way of royalty and then added, "Well, now, wait a minute. You are not going to get any more. There are ways of having this as we want it. I am sufficiently familiar with the patent laws and shop rights, that if we wanted to take this boiler, we wouldn't have to worry about it and we intend making this boiler. Now, the rest is up to you; if you don't want to take a dollar, the rest is up to you." This threat of piracy was not an empty one and, as will be presently seen, was carried out in open defiance not alone of Burkhart's rights under the contract but also of his rights as the inventor of a patentable boiler, for which his patent application was then pending and for which he later received his letters patent.
After the attempted cancellation of the contract Bogue found a market not alone for those boilers remaining undelivered under its contract with complainants but for many additional boilers of the same kind. The contract called for *Page 563 
623 boilers. Bogue delivered in June 293 boilers and later another 18 boilers, making a total of 311 boilers, leaving undelivered 312 boilers called for by the contract. How many boilers Bogue thereafter sold to other parties awaits the discovery which will flow from the accounting that I shall award. Bogue's president admitted before me that since his company delivered to complainants the 293 boilers, Bogue sold to third parties approximately 500 boilers. If this be the figure, then Bogue sold to third persons not only the 312 boilers that should have been delivered to the complainants but another 188 boilers which it had no right to manufacture. Most of these boilers, if not all, were sold by Bogue despite the fact that since August 14th, 1946, Bogue and its officers have been under a restraint imposed by this court against selling and delivering to any person other than complainants, any of the boilers manufactured under complainants' specifications. This violation is sought to be explained away by Bogue and its president, Shinman, by what constitutes the major defense in this case, namely, that the boilers so manufactured and sold by Bogue were not like the Burkhart boiler and are basically different from the type of boiler shown in the plans and drawings attached to the contract between the parties. This defense was not sustained, which conclusion I reached from a careful analysis of the expert testimony offered on each side of the controversy and by a personal inspection and comparison made by me of the three boilers brought into court and received in evidence.
There were received in evidence three boilers manufactured by Bogue. One of them came from the deliveries made by Bogue to complainants. The other two boilers were sold by Bogue to third parties after the present suit was instituted. Also received in evidence were two sets of plans, one being the plans attached to the agreement between the parties, according to which plans Bogue was to manufacture the 623 boilers for the complainants. The other set of plans represented those which the defendant claimed were different and under which the defendant was producing what it claimed to be an entirely different boiler. The testimony furnished by complainants' experts, men of impressive qualifications, was *Page 564 
to the effect that the two types of boilers were substantially alike and that the plans underlying them, respectively, were substantially alike. It was not disputed that there were some differences. Those differences are few in number and will here be stated. The Burkhart boiler had vertical rectangular tubes. The openings of these tubes did not constitute perfect rectangles but the corners were slightly rounded. The defendant's boiler, which Bogue sold after it attempted to cancel its contract with the complainants, also had vertical rectangular tubes which, though a bit more rounded, are nonetheless substantially rectangular. The change in the rounding off of the corners from the one to the other was, to the eye, very slight, and the testimony from the experts satisfied me that in respect of utility the change was meaningless.
Inside the tubes in the Burkhart boiler were removable pieces of metal called "restrictors." It would seem from all the testimony in the case that these restrictors were of little functional value and that the inclusion or elimination of this item did not affect the structure, capacity or functional utility of the boiler. The tubes in defendant's boiler also contained a removable restrictor of somewhat different appearance but, like the Burkhart restrictor, was of zigzag shape and intended to do the same kind of work. It was clear to me that the two restrictors were almost alike and that their differences were not significant.
The Burkhart boiler had what is called "internal baffling." It was claimed for the defendant's boiler that it omits the baffling, although one of the boilers in evidence which the defendant sold during the pendency of this suit has internal baffling. I am convinced from the testimony that the feature of "internal baffling" is not important and that its omission from the defendant's boiler does not work a material change or departure. But if this were not so, the defendant would gain nothing by the fact. The defendant strongly emphasizes the fact that its boiler has no "internal baffling" but it overlooks the express language of its covenant, contained in the settlement agreement of May 21st, 1946. There it agreed that it would not manufacture, sell or deliver to anyone (other than the 623 boilers to be manufactured for the complainants) *Page 565 
any boiler constructed in accordance with the annexed plans, "particularly but not by way of limitation in so far as same relates to internal baffling." In simpler words, the defendant agreed not to manufacture for others the Burkhart boiler with or without the internal baffling shown on the controlling plans. For the defendant now to say that its boiler is different because it omits the internal baffling shown on the Burkhart plans, is to fly in the teeth of the defendant's express agreement on the point.
There are two or three other differences between the two boilers, such as the location of the water gauge and some change in dimensions. All the experts seem to agree that these differences are so few and inconsequential as to have no bearing on the question of the basic identity of the two boilers. So convincing was the proof that the two boilers are basically and virtually alike, that I was prepared to find that fact immediately upon the conclusion of the proofs. I reserved decision only because of the defense sought to be interposed that the defendant's covenant was invalid because, as is claimed, it is in restraint of trade. I shall deal with that later herein.
I am satisfied that Bogue at all times realized that the Burkhart boiler had novelty and could command a good market. That in fact it possessed features of novelty is evident from the circumstance that for that boiler the Patent Office subsequently granted a patent. Bogue wanted to be free to manufacture the Burkhart boiler for the general market and it endeavored through its sales manager, Mr. La Molla, to obtain a license agreement at a royalty of $1 for each boiler. When it failed in this endeavor, it carried out its threat of manufacturing the Burkhart boiler anyway. This it apparently believed could be accomplished by cancelling the existing contract under the claim that the two weeks' delay in payment was a breach on the part of the complainants. I doubt not that it entertained the idea that once the contract were canceled and if the cancellation could stick, with the fall of the contract would fall the negative restrictive covenant therein contained. I find and hold that the Bogue boiler (the one which the defendant says it has been manufacturing *Page 566 
and selling since it broke relations with the complainants) is the same kind and type of boiler, structurally and functionally, as the boiler described in the agreement between the parties, and that the Bogue boiler is being built substantially in accordance with the same plans and drawings as are attached to that agreement.
I am now brought to the defense that the negative covenant in the contract is invalid because it is claimed to be in restraint of trade. Somewhere near the close of the proofs the defendant Bogue applied for an order to amend its answer and to be permitted to plead that the defendant's negative covenant, contained in paragraph 2 of the agreement of May 21st, 1946, is not enforceable because "it is not limited either in point of time or in point of space" and also because it "constitutes an unreasonable restraint of trade, is against public policy and is therefore void." I allowed the amendment and have since considered the defense thereby presented. I find it to be without merit for the following reasons:
The defendant's covenant is not that it will not manufacture and sell heating boilers generally but only a particular type of boiler, identified by the drawings attached to the agreement containing that covenant. The restraint is limited strictly to that type of boiler and the defendant is left entirely free to manufacture and sell boilers of every other conceivable type and variety. What the parties sought to accomplish by Burkhart exacting and Bogue furnishing the negative covenant in question was the protection of the Burkhart invention. It was not only a trade secret but one which might ripen into a legal monopoly if and when letters patent for that boiler were granted. As a trade secret it was entrusted to Shinman, Bogue's president, under a promise of confidence and secrecy. Even if the promise had not been given, the disclosure of it to the defendant was one in confidence and for the very limited purpose of having the defendant manufacture the boiler for complainants alone. Bogue and its president were fiduciaries of that secret and were not free to disclose it or to utilize it for their own advantage. Bogue's covenant not to manufacture that boiler for others was merely declaratory of the legal disability that it was under, not to *Page 567 
utilize for itself the trade secret of another, confidentially entrusted. The covenant was undoubtedly taken by complainants for the reason that their earlier experience with Bogue indicated that the latter's promises had better be in writing. To such a situation and to such a covenant the law forbidding agreements in restraint of trade is wholly inapplicable. Bogue's counsel has cited many cases where restrictive covenants were held bad because of generality and lack of limitation either in respect of area or time. All those cases involved agreements not to compete generally in certain fields of industry, but not one of them involved a covenant confined to a single article, unique in character, in that it represented a trade secret or a novel idea or a patented invention. Defendant's counsel cites the case ofVoices, Inc., v. Metal Tone Manufacturing Co., Inc., 119 N.J. Eq. 324; 182 Atl. Rep. 880; affirmed, 120 N.J. Eq. 618;187 Atl. Rep. 366, where our courts sustained a covenant not to manufacture or sell sound producing devices within a certain area and within a fixed period of time. From this case counsel draws the conclusion that all covenants must be so limited in order to be enforceable. An examination of that case shows that there the covenantor agreed not to manufacture or sell any sound producing devices for dolls. It will be noted that in the cited case the defendants claimed that the restrictive covenant did not contemplate the particular device manufactured by the defendants and which the complainant deemed violative of the covenant. Vice-Chancellor Egan pointed out in his opinion that the covenant related to any sound producing devices. It is thus seen that the covenant there related generally to an article of production and therefore it was appropriate to consider those provisions of the contract which expressed a limitation of time and space. It follows that if the covenant there had been construed to relate to a single kind of sound producing device, the discussion by the court of time and space would have been unnecessary.
Complainants' counsel called my attention to a case which I consider directly in point. It is that of New Hermes, Inc., v.Alexander, decided by the Special Term (Equity Division) of the New York Supreme Court and reported in the New *Page 568 York Law Journal under date of November 26th, 1947. It is not officially reported. In addition to the published opinion I was furnished with the pleadings and evidence in that case. That was a suit to enjoin the defendant from manufacturing and selling engraving machines and to recover damages said to have resulted from the defendant's breach of his covenant that he "will stop manufacturing and distributing engraving machines after those which he now has in stock to the extent of 87 machines have been disposed of." Previously to the making of this agreement the plaintiff had brought in the federal court an action to restrain the defendant from patent infringement and unfair competition, it being charged that the defendant had copied the plaintiff's portable engraving machine and was either selling it or distributing it on some renting arrangement. That suit was settled and discontinued by reason of a settlement agreement in which the defendant bound himself as above quoted. He disposed of the 87 machines and thereafter began manufacturing and selling engraving machines of substantially different size and type. In the second suit (the one in the New York Supreme Court) the plaintiff sought to restrain the defendant from manufacturing and selling engraving machines of any kind. The defendant contended that his covenant related to the particular kind of engraving machine which the plaintiff had been manufacturing at the time of the federal suit and the defendant sought reformation of the covenant so that it would be so limited. The Supreme Court, in dismissing both the complaint for injunction and the counter-claim for reformation, said:
"After hearing the testimony, I hold that the language of the agreement must be construed not to have prohibited defendant from manufacturing or distributing any and all engraving machines, but only machines which were similar to those which defendant was manufacturing at the time the infringement suit was brought and of which he still had 87 in his possession. The parties, at the time the patent suit was settled, were only concerned with the machines then being manufactured, and a reasonable construction requires that the contract be limited to those engraving machines. To place *Page 569 
upon the agreement the construction urged by plaintiff would result in an interpretation that would tend toward an unreasonable restraint of trade, since it would prohibit defendant from ever manufacturing or distributing engraving machines of any kind or description without limitation as to time or area. Since defendant is not manufacturing or distributing any engraving machines of the type covered by plaintiff's patent, plaintiff is not entitled to the relief sought for herein. The complaint is therefore dismissed without costs. The counter-claim is likewise dismissed, since there is no necessity for reformation."
The rationale of the decision in the New Hermes Case is that where such negative covenant as we here deal with relates to a particular type, the covenant need not be limited in time or space but that such limitation is required only when the covenant relates to a general class of merchandise.
As I have already said the plans for the Burkhart boiler were a trade secret and were given and received in confidence, and that that was an added reason why the property right in those plans and in the Burkhart boiler merits protection. Williston in his work on Contracts (revised edition), volume 5, section 1646,page 4623, says:
"The law recognizes a right of property in trade secrets. As such property loses its only value if the secret is disclosed, any one who acquires knowledge thereof in a confidential capacity, as that of an employee, is under an obligation, which equity will enforce, not to disclose the secret or use it for his own advantage, even if he makes no express contract to this effect." Citing inter alia the New Jersey cases of VulcanDetinning Co. v. American Can Co., 72 N.J. Eq. 387; Maas Waldstein v. Walker, 100 N.J. Eq. 224: Kellems Products, Inc.,
v. Coley, 10 N.J. Mis. R. 695.
"It necessarily follows from the recognition of property in trade secrets that express contracts which prohibit their disclosure by those entrusted with knowledge of them are valid and may be as broad as is necessary to protect the owner from injury by the disclosure of the secret or its competitive use." (Italics mine.)
Even without the covenant here involved, Bogue would not be permitted to make competitive use of the Burkhart boiler or the plans therefor. The covenant carries with it a recognition of complainants' property right. Because of the principles of unfair competition, because of the covenant itself, *Page 570 
and because it relates to a single item in which complainants have a special property right and does not relate to boilersgenerally, I hold that the covenant in question need not be limited or qualified in point of time or space. I hold that that covenant and the protection it gives are reasonably necessary to the complainants and that the defense of invalidity cannot be maintained against it.
By this suit complainants seek an injunction against the defendants manufacturing and selling boilers which are substantially of the type of the Burkhart boiler and for an accounting of profits on all such boilers sold to third parties. Complainants also ask for defendants' profits on such sales to third parties made before the contract of May 21st, 1946. With respect to such antecedent sales, the contract contains a release from the complainants to Bogue, but coupled with that release is the stated condition that if Bogue manufactures, sells or delivers after the date of the contract any boiler of the type affected by the contract (excepting the 623 boilers due the complainants), then the release should become ineffective, as if it had not been given. It appears in the case that since the release was given the defendant sold to third parties about 500 boilers which are basically the Burkhart boiler. Because of the express condition contained in the release and its said violation the release has ceased to be binding. Complainants are entitled to an accounting of profits for all such sales made before and since the contract of May 21st, 1946. The complainants have prayed in their bill for "compensation" and have also prayed for general relief. I think complainants should have either the defendants' profits or their own damages resulting from the defendants' wrong. See Mantell v. International PlasticHarmonica Corp., 138 N.J. Eq. 562: 49 Atl. Rep. 2d 290;
affirmed, 141 N.J. Eq. 379; 55 Atl. Rep. 2d 250.
Complainants may not have both. A reference will be made to a special master to ascertain such profits and damages.
It might at this point be added that the relief which will be given to the complainants against both defendants is not only based upon the contract between the complainants and Bogue but also upon the principles which govern cases of unfair competition. Even if the contract had not been entered *Page 571 
into, the defendants would not be permitted to continue to manufacture the Bogue boiler, the idea and plans for which were the special property of the complainants, confidentially entrusted to Bogue and its president. Club Razor and Blade Mfg.Corp. v. Bindzsus, 131 N.J. Eq. 283; 25 Atl. Rep. 2d 31;
affirmed, 133 N.J. Eq. 38; 30 Atl. Rep. 2d 31. If the contract were absent, this court would nonetheless grant the relief of an injunction against future manufacture and an accounting for past wrongs.
Early in the course of the final hearing it was admitted by Shinman that the boilers being manufactured by Bogue were being sold by it to Homease Products Division, Inc., that the latter, in turn, sold those boilers to third parties, and that all the stock of the Homease Products Division, Inc., was owned by Shinman. It thus appearing that the Homease Products Division, Inc., is an alter ego of Bogue and would be as answerable in point of relief to the complainants as would be Bogue in the event relief were granted against the latter, an order declaring such liability was entered with the consent of both Bogue and the Homease Products Division, Inc. By that order Homease was joined as a party defendant, and with its consent it was stated that its defenses to the bill should be the same defenses set forth in the answer of Bogue, without the necessity of the added defendant filing its independent answer, and that the cause proceed to final determination as though Homease had been originally joined as a co-defendant and had duly filed an answer in form and substance like the answer of Bogue. That order, consented to by Homease, is in essence a stipulation by it that whatever relief might be awarded against Bogue should also be granted against Homease. There will therefore be an injunction against both defendants, permanently restraining them from manufacturing or selling the type of boiler which they have been manufacturing and selling and any other type of boiler basically or substantially like the Burkhart boiler or basically or substantially conforming to the plans and specifications attached to the contract between complainants and Bogue. The accounting above directed will be against both defendants.
A decree for complainants, in accordance with these conclusions, will be entered on notice. *Page 572